IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

TRACY ANDERSON,

                         Plaintiff,                        OPINION AND ORDER

    v.

                                                            15-cv-785-wmc

TREVOR RADKE, ET AL.,[1]

                         Defendants.

*Pro se* inmate plaintiff Tracy Anderson brought suit under 42 U.S.C. § 1983, alleging that various officers at the Waupun Correctional Institution ("Waupun" or "WCI") used excessive force and committed battery and assault while transporting him to segregation in October 2015, and WCI Lieutenant Trevor Radke further failed to intervene to stop them. Defendants moved for summary judgment. (Dkt. #24.) For the reasons detailed below, defendants' motion will be granted in part and denied in part.

UNDISPUTED FACTS[2]

Anderson is an inmate at WCI. In October 2015, he was housed in cell I-13 in its Unit North West Cell Hall. Defendants were all employed by the Wisconsin Department

---

[1] The parties originally captioned their filings with defendant William Pollard as the lead defendant, and they have continued to do so even after his dismissal at the screening stage. (*See* dkt. #10 at 8.) Going forward, the caption should be titled as above. Additionally, in the complaint and in the screening order, defendant Radke is erroneously referred to as "Radtke," despite his name being spelled "Radke" in his declaration and in filings by the AG's office. Going forward, the court and parties should adopt the latter spelling.

[2] Viewing the facts in the light most favorable to plaintiff as the non-moving party, the following facts are material and undisputed for purposes of summary judgment, except where noted below. Because Anderson's complaint was "verified," meaning that he swore under penalty of perjury that the alleged facts are true, the allegations are accepted as admissible evidence in the context of a motion for summary judgment, unless he appears to lack personal knowledge of the statements. *See Devbrow v. Gallegos*, 735 F.3d 584, 587 (7th Cir. 2013) ("A verified complaint is the equivalent of an affidavit for summary judgment purposes.").

of Corrections ("DOC") at WCI during that same time period; Trevor Radke as a lieutenant; defendant Timothy Price as a correctional sergeant; and defendants Thomas Miller, Thomas O'Neill, and Daniel Winters as correctional officers.

As a result of Anderson being issued Conduct Report #2720598 on October 30, 2015, the parties agree that he lost his electronics privileges, and on the following day, Sergeant Price told Anderson to go to his cell and take his electronics to the control area. The parties disagree about most of what happened thereafter, except that: (1) Anderson returned to his cell, but refused to turn over his electronics; (2) defendants Miller, O'Neill, and Winters arrived at cell I-13 in response to a radio call; (3) Anderson was in the back of his cell when Lieutenant Radke arrived around 8:45 p.m.; (4) Radke took his X-26 Taser from its holster, but did not use it on Anderson; (5) Anderson complied with Radke's order to place his hands behind his back, turn around, and walk backwards towards the cell door; (6) Anderson was transported to Restrictive Housing Unit ("RHU"); (7) Anderson was handcuffed in RHU; and (8) Anderson was seen by a nurse and complained that his hand was numb while still handcuffed. Finally, the parties agree that Anderson failed to file a notice of claim related to these events as required by Wisconsin law.

A. Plaintiff's Version of Events

In Anderson's version of events, he responded to the direction to turn over his electronics by stating "I did nothing wrong," but then returned to his cell.[3] (Pl.'s Resp. to

---

[3] Anderson's verified complaint provides additional details, including that he protested his right to due process before making clear his intent to keep his electronics pending appeal. On his walk back to his cell, he also allegedly said, "you racist ass pigs on some bullshit!" and protested that he was free to write what he wanted in his letters as long as he did not instruct anyone to violate DOC rules. (Compl. (dkt. #1) ¶ 6.)

Defs.' PFOF (dkt. #37) ¶ 5.) Once at his cell, Anderson also explained that he would rather go into segregation then give up his electronics because he did not break any rules. (*Id.* ¶ 6.) Anderson then claims he stayed in the back of his cell until ordered out and kept his shirt on until he arrived at RHU. (*Id.* ¶¶ 7-8.) He acknowledges "verbalizing [his] discontent about the injustice." (Anderson Decl. (dkt. #38) ¶ 8; *see also* Wallace Decl. (dkt. #39) ¶ 3.) He denies being directed to put his hands behind him and to turn around until he was ordered to do so by Radke, at which point he complied. (Pl.'s Resp. to Defs.' PFOF (dkt. #37) ¶¶ 12, 13.) He contends that Radke pointed the Taser at him. (*Id.* ¶ 13; Wallace Decl. (dkt. #29) ¶ 3.) In complying with Radke's order, he asserts that he never threatened to kill anyone, but instead called the officers "racist honkys [sic]." (Pl.'s Resp. to Defs.' PFOF (dkt. #37) ¶ 14.) He also asserts that he did not resist and did not try to kick the officers. (*Id.* ¶¶ 17, 19-20, 24-25; *see also* Wallace Decl. (dkt. #39) ¶¶ 4-5.) He further claims that after being handcuffed behind his back and kneeling as ordered, the officers attacked him. (Anderson Decl. (dkt. #38) ¶ 10; Wilburn Decl. (dkt. #42) ¶ 3.)[4]

Specifically, Anderson contends that Sergeant Price pushed his head into the doorframe, Officer O'Neill shoved him to the floor, kneed his back and placed a knee on his neck, while Officer Winters also kneed his back. (Anderson Decl. (dkt. #38) ¶¶ 11, 13; Wallace Decl. (dkt. #39) ¶¶ 7, 10-11.) He adds that Officer O'Neill choked him saying, "I'll fuckin' kill you!" (Pl.'s Resp. to Defs.' PFOF (dkt. #37) ¶ 21; *see also* Yeoman Decl. (dkt. #40) ¶ 4.) According to Anderson, Radke did nothing to stop this assault.

---

[4] In his complaint, Anderson averred that when he was initially being handcuffed he informed the officers that the cuffs were too tight and hurting him. (*Id.* ¶ 10.)

(Anderson Decl. (dkt. #38) ¶ 12.)

Anderson agrees that the officers eventually helped him off the floor, but contends that O'Neill and Winters bent his wrists while doing so, "causing excruciating pain" during his walk to RHU.[5] (Pl.'s Resp. to Defs.' PFOF (dkt. #37) ¶ 26.) Unlike defendants' version of events, where he was offered the opportunity to walk forward, Anderson asserts that once out of sight of the other inmates, defendants O'Neill, Price, Winters and Miller began punching his torso. (Compl. (dkt. #1) ¶ 17; *see also* Khalid Decl. (dkt. #41) ¶ 9 (testifying that once Anderson was out of view, he could hear him "hollering in pain about the officers hurting his neck and asking them to stop hitting him").)[6] O'Neill again choked Anderson, yelling "Shut the fuck up before I kill you" and "Stop resisting!" (Compl. (dkt. #1) ¶ 18.)

By the time they arrived at RHU, Anderson claims his wrist was already swollen. (*Id.* ¶ 19.) Nevertheless, once there, Anderson contends that Winters tightened his handcuffs, asking "is that tight[] enough fucker[?]" (Pl.'s Resp. to Defs.' PFOF (dkt. #37) ¶ 28.) Despite reporting his injuries to Radke and complaining about the handcuffs' tightness "several times," Anderson further claims Radke denied his requests for medical attention and photographs. (*Id.* ¶¶ 29-31.) While he acknowledges seeing a nurse in RHU, who directed that the cuffs be loosened, he disputes that they were loosened until he was stripped. (*Id.* ¶¶ 33, 39.) Finally, he contends Radke said, "I don't take orders from nurses." (Compl. (dkt. #1) ¶ 23.)

---

[5] Anderson's declarants suggest that Anderson was dragged down the hallway by his neck. (Wallace Decl. (dkt. #39) ¶ 12; Yeoman Decl. (dkt. #40) ¶¶ 4-5; Khalid Decl. (dkt. #41) ¶ 4.)

[6] Anderson's complaint refers to an Officer "Neal," who was later replaced by defendant O'Neill, as well as a John Doe officer, who was replaced by defendant Miller. (Order (dkt. #17).)

Not surprisingly given his version of events, Anderson specifically disputes defendants' contention that they only used necessary force. Rather, he maintains not only that he was never resisting, but the officers needlessly struck and hit him several times. (Pl.'s Resp. to Defs.' PFOF (dkt. #37) ¶¶ 34-35.)

B. **Defendants' Version of Events**

In contrast, defendants maintain that Anderson's refusal to cooperate with the turnover of his electronics was far less principled and far more disagreeable. Specifically, defendants contend that Anderson responded to Lieutenant Radke's direction to turn over his electronics by yelling, "Fuck You! You ain't taking my shit. You try to take it, and I will whip all your mother fucking honky asses." This resulted in Sergeant Price radioing for a supervisor. (Defs.' PFOF (dkt. #26) ¶ 5.) Next, they assert Anderson began to return to his cell while shouting, "you watch me, I am going to fuck them up! They think they are going to take my shit! I am going to whip the[ir] fucking bitch asses." (*Id.* ¶ 6.) When he returned to his cell, Anderson "locked it open," which allowed him to walk out of the cell and was "aggressively removing his shirt." (*Id.* ¶¶ 6-7.) With Anderson continuing to be verbally combative, defendants contend that he needed to be "contain[ed]." (*Id.* ¶ 8.)

When Officers Miller, O'Neill, and Winters arrived at cell I-13, Sergeant Price informed them that Anderson had refused to leave his cell to be put in wrist restraints. (*Id.* ¶¶ 9-10.) Lieutenant Radke arrived while the other defendants were instructing Anderson to place his hands behind his back and turn around. (*Id.* ¶¶ 11-12.) While Radke acknowledges holding his Taser at the ready by his side, he denies pointing it at Anderson. (*Id.* ¶ 13.) While defendants contend Anderson still shouted "I'm going to kill you

5

motherfuckers, you fucking honkeys can't stop me," they agree he complied with Radke's direction to turn around and back out of his cell so his hands could be restrained. (*Id.* ¶¶ 13-14.)

At that point, Price informed Radke that Anderson had again refused to surrender his electronics, indicating that he would go to "the hole" instead. (*Id.* ¶ 15.) Lieutenant Radke then supervised the other defendants' attempts to restrain Anderson further, while Anderson continued to threaten the officers. (*Id.* ¶ 15.) Because of these threats, Radke directed the other officers to place leg restraints on Anderson, who again initially complied by kneeling down. (*Id.* ¶¶ 16-17.) Nevertheless, defendants contend that Anderson then began resisting the officers' attempts to apply the mechanical leg restraints, and the officers, at Radke's direction, applied pressure to Anderson's arms and shoulders to stabilize and lower him further to the ground and apply the leg restraints. (*Id.* ¶ 19.)

After the leg restraints were fastened, the officers helped him stand back up, but he continued resisting and threatening the officers' lives. (*Id.* ¶ 20.) The officers then began escorting Anderson towards the RHU using a three-man escort pursuant to policy and at Radke's direction.[7] (*Id.* ¶ 21.)

At the end of the cell hall, knowing that the three-man escort is uncomfortable and that once out of the sight of other prisoners Anderson would no longer have peer-pressure to keep resisting, Lieutenant Radke avers that: he offered Anderson an opportunity to comply with the escort and to walk forward-facing the remainder of the route to RHU;

---

[7] Defendants explain that the three-man escort involves three officers escorting a backwards-walking inmate, with one officer holding each arm and the inmate's head. This technique is designed to prevent further resistance and injury to the inmate or officers. (Defs.' PFOF (dkt. #26) ¶ 22.)

Anderson agreed; and he walked the rest of the way with O'Neill securing his left arm and Winters his right. (*Id.* ¶¶ 24-26.) Even then, defendants contend that Anderson continued threatening to kill the officers. (*Id.* ¶ 27.) Officers O'Neill and Winters left Anderson in strip cell #1. (*Id.* ¶ 28.) According to defendants, Anderson refused Radke's offer to see a nurse at that time, but agreed to comply with the processing for Temporary Lock Up status. (*Id.* ¶ 29.) Defendants contend no one reported injuries to Radke. (*Id.* ¶ 30.) Before leaving, Radke saw no indication that the wrist restraints were too tight or otherwise injuring Anderson, and Anderson was not complaining about them. (*Id.* ¶¶ 31, 33.)

Anderson was seen by a nurse around 9:20 p.m. that same night, at which point he complained his hand was numb. (*Id.* ¶¶ 37-38.) Defendants contend that the nurse instructed the supervisor to loosen the handcuffs, and because "security supervisors always follow the decisions of the nurses when they make a medical decision about whether to loosen wrist restraints," the cuffs were loosened. (*Id.* ¶¶ 39-40.)

Defendants deny ever using unnecessary force or "untrained techniques" on Anderson, including acting unprofessionally, striking Anderson, or kneeling on Anderson. (*Id.* ¶¶ 35-36.) Defendants add that there is no recording of these events because: (1) Anderson's resistance created a "reactive use of force" incident, such that "each of the officers was needed to take immediate action to stop Anderson from resisting"; and (2) hallway cameras did not cover the area around cell I-13. (*Id.* ¶ 34.)

### C. Lingering Injuries

The parties agree that four days later, a nurse saw Anderson with a scab on his wrist and advised that his musculoskeletal issues would resolve in a few weeks. In the meantime,

7

the nurse recommended that he take Tylenol and naproxen for pain. Roughly three weeks after the alleged assault, on November 19, 2015, Anderson also received a prescription for Meloxicam for neck pain and was seen by an "advanced care provider." Anderson contends he was further prescribed therapy for back and neck injuries caused by these events.

OPINION

At screening, plaintiff was granted leave to proceed on his Eighth Amendment excessive force claim, as well as state law claims for assault and battery, against defendants Miller, O'Neill, Price and Winters, as well as an Eighth Amendment deliberate indifference claim against defendant Radke. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At summary judgment, the district court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The court must "view the facts in the light most favorable to the non-moving party," including drawing "all reasonable inferences from those facts in [the non-moving party's] favor." *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 366 (7th Cir. 1997) (citing *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978 (7th Cir. 1996)). Because there are multiple material facts in dispute -- most notably whether plaintiff resisted and what level of force defendants actually used -- summary judgment is inappropriate on plaintiff's Eighth Amendment claims.

I. Excessive Force

The Eighth Amendment's Cruel and Unusual Punishments Clause protects prisoners from prison officials' use of excessive physical force. *Hudson v. McMillian*, 503 U.S. 1, 6-7

(1992). For a plaintiff to succeed on an excessive force claim, he must submit evidence that the prison official acted "wantonly or, stated another way, 'maliciously and sadistically for the very purpose of causing harm.'" *Harper v. Albert*, 400 F.3d 1052, 1065 (7th Cir. 2005) (quoting *Whitley v. Albers*, 475 U.S. 312, 320 (1986)). Relevant factors are: (1) the need for the application of force; (2) the relationship between the need and the amount of force used; (3) the extent of injury inflicted; (4) the extent of threat to the safety of staff and inmates, as reasonably perceived by the responsible officials based on the facts known to them; and (5) any efforts made to temper the severity of a forceful response. *Whitley*, 475 U.S. at 321. Because prison officials must sometimes use force to maintain order, the central inquiry is whether the force "was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6-7. At summary judgment, a plaintiff must put forward evidence that would "support a reliable inference of wantonness in the infliction of pain." *Fillmore v. Page*, 358 F.3d 496, 504 (7th Cir. 2004) (quoting *Whitley*, 475 U.S. at 322). Plaintiff's version of events does just that.

Defendants argue generally that "[t]heir action[s] were appropriate, they deescalated the situation, and they obviated the need for the use of more force despite Anderson's continued resistance." (Defs.' Summ. J. Br. (dkt. #25) 11.) However, this argument presupposes that plaintiff refused to comply with directions *and* was resisting, both of which plaintiff repeatedly denies. At most, plaintiff acknowledges being belligerent and refusing to obey an order to turn over his electronics, choosing segregation rather than what he viewed to be a violation of his due process rights. This is certainly grounds for punishment, including the need perhaps to remove him safely from his cell. The issue remains whether plaintiff was sufficiently uncooperative to justify the kind of force used. While a reasonable jury might well conclude it was, given plaintiff's version of the facts -- as well as defendants' acknowledgement

that he complied with the directions to turn around, allow handcuffs to be applied and took a kneeling position for leg restraints -- the answer could reasonably be "no," especially when plaintiff claims he was repeatedly hit even after full restraints were in place. Accordingly, there are material facts in dispute that preclude an award of summary judgment to either side.

For similar reasons, defendants are not entitled to summary judgment on plaintiff's excessive force claim concerning the tightness of the handcuffs and Radke's alleged refusal to loosen them. Defendants contend that plaintiff voiced only minimal complaints, and showed no physical signs that the restraints were too tight. (*See id.* at 13-14.) However, plaintiff paints a vastly different picture, asserting that he complained before he even got to RHU and then "several" times once there, after his wrists were visibly swollen. He also claims in response that defendants actually tightened the handcuffs, only loosening them when he was stripped (and despite the nurse's recommendation to do so sooner). In contrast, defendants contend that plaintiff only complained to the nurse about his wrists, and the handcuffs were promptly loosened at her direction. Again, there are material facts in dispute making summary judgment inappropriate.[8]

## II. Failure to Intervene

A prison official may be liable if he knew about a constitutional violation and had the ability to intervene, but failed to do so. *Koutnik v. Brown*, 351 F. Supp. 2d 871, 876 (W.D. Wis. 2004) (citing *Fillmore*, 358 F.3d at 505-06). To create a cause of action, the

---

[8] Defendants also argue that they are entitled to "dismiss[al]" of plaintiff's claims because his injuries were minor and "cannot support his excessive force claim where his own resistant actions required the officers to forcibl[y] restrain him." (Defs.' Summ. J. Br. (dkt. #25) 15.) Again, there is conflicting evidence about whether plaintiff resisted, as well as the extent of his injuries. Accordingly, this, too, is not an appropriate basis for summary judgment.

failure to intervene must be in "deliberate or reckless disregard" of the inmate's constitutional rights. *Fillmore*, 358 F.3d at 506.

Defendants argue that Lieutenant Radke is entitled to summary judgment on plaintiff's failure to intervene claim "because the officers acted properly and did not engage in excessive force[ so] there was no constitutional violation for Radke to intervene in," and instead, Radke "supervised while the officers appropriately restrained and escorted Anderson." (Defs.' Summ. J. Br. (dkt. #25) 16.) Unfortunately, this argument suffers from the same defect as the defendants' argument for summary judgment on the more expansive Eighth Amendment claim: it assumes facts very much in dispute for reasons previously discussed. Whether there was an Eighth Amendment excessive force violation and whether Radke failed to intervene in the face of it are *both* questions for the jury.[9]

## III. Assault & Battery

Unlike plaintiff's constitutional claims, defendants are entitled to summary judgment on his state tort claims. While the court granted plaintiff leave to proceed on state assault and battery claims, the evidence now shows -- and plaintiff does not dispute -- that he failed to file a notice of these claims as required by Wis. Stat. § 893.82. A plaintiff must file a notice of claim with the Attorney General to commence suit against a state officer, employee or agent:

> [N]o civil action or civil proceeding may be brought against any state officer, employee or agent for or on account of any act growing out of or committed in the course of the discharge of the officer's, employee's or agent's duties . . . unless within

---

[9] Plaintiff has not requested assistance in recruiting counsel and appears capable of representing himself at trial. To assist him, the court has issued the attached trial preparation order, containing information about procedures for his review.

11

> 120 days of the event causing the injury, damage or death giving rise to the civil action or civil proceeding, the claimant in the action or proceeding serves upon the attorney general written notice of a claim stating the time, date, location and the circumstances of the event giving rise to the claim for the injury, damage or death and the names of persons involved, including the name of the state officer, employee or agent involved.

Wis. Stat. § 893.82(3). Compliance with this statute is a jurisdictional prerequisite to proceeding with a state law claim against a state official. *Ruh v. Samerjan*, 816 F. Supp. 1326, 1330 (E.D. Wis. 1993) (citing *Ibrahim v. Samore*, 118 Wis. 2d 720, 726, 348 N.W.2d 554 (1984)).

Since it is undisputed that plaintiff failed to file a notice of claim against defendants Miller, O'Neill, Price and Winters, they are entitled to summary judgment on his state-law claims.

ORDER

IT IS ORDERED that Defendants' motion for summary judgment (dkt. #24) is GRANTED IN PART AND DENIED IN PART as set forth above.

Entered this 9th day of August, 2018.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge